STATE OF NORTH CAROLINA v. PEGGY MASSEY LEONARD

No. 96

(Filed 3 June 1980)

**1. Constitutional Law § 50— inapplicability of Speedy Trial Act**

The statute requiring the trial of a defendant within a certain time after a new trial has been granted on appeal, G.S. 15A-701(a)(5), did not apply where defendant was arrested, indicted and first placed on trial before 1 October 1978, the effective date of the statute.

**2. Constitutional Law § 51— speedy trial—retrials—mental commitments**

Defendant was not denied her constitutional right to a speedy trial where she was arrested on 18 May 1977; she was committed to a State mental hospital on 19 May 1977 to determine her competency to stand trial; an indictment was returned against her in September 1977; she was brought to trial at the 2 November 1977 session and a mistrial was declared upon motion of defense counsel; she was again tried at the 12 December 1977 session and was found guilty of first degree murder; she was awarded a new trial on appeal in an opinion certified to the superior court on 18 December 1978; she was again committed to a State mental hospital upon motion of her counsel on 19 December 1978; the hospital notified the court on 13 February 1979 that de-

fendant was competent to stand trial; and defendant was again placed on trial at the 30 April 1979 session of court.

**3. Criminal Law § 75.14— volunteered statements—admissibility without determination of mental competence**

In a prosecution for first degree murder, the State could introduce evidence of questions asked the arresting officer by defendant upon her sole initiative as to how many times she shot the victim and whether the State still had the death penalty without a preliminary inquiry into defendant's mental competence to understand the nature and gravity of those questions. Evidence proffered by defendant on voir dire upon the question of defendant's mental competence at the time she asked the questions would have been appropriate before the jury for its determination of the credibility of any statements by defendant but not upon the admissibility of those statements.

**4. Homicide § 21.5— first degree murder—sufficiency of evidence**

The State's evidence, including the testimony of two eyewitnesses, was sufficient to support defendant's conviction of first degree murder of her sister.

**5. Criminal Law § 86.5— cross-examination of defendant—impeachment—shooting of person in Florida—alleged verdict of not guilty by reason of insanity**

In this prosecution of defendant for the first degree murder of her sister, the trial court properly permitted cross-examination of defendant for impeachment purposes concerning whether she shot and killed a person in Florida in 1973, notwithstanding defendant's contention that she was found not guilty by reason of insanity of the 1973 Florida killing, since (1) defendant's hearsay testimony on voir dire was not sufficient to support a finding that defendant in fact had been found not guilty of the Florida killing by reason of insanity, and (2) a defendant may be asked if he in fact committed a crime so long as the question is asked in good faith. However, cross-examination of defendant concerning the 1973 Florida killing was improperly permitted for the purpose of identification, but such error was harmless in light of the overwhelming evidence that defendant shot and killed her sister.

**6. Criminal Law § 86.5— cross-examination of defendant—impeachment—prior acts of misconduct—mental responsibility for acts**

The prosecutor was not precluded from cross-examining defendant about prior acts of misconduct on the ground that defendant's long history of mental disease shows that she was not mentally responsible for her prior acts of misconduct where defendant's evidence showed that her mental disorder did not always prevent her from knowing right from wrong or the nature and quality of her acts, and there was no evidence of defendant's inability to distinguish right from wrong at the specific times of her prior acts of misconduct about which the prosecutor cross-examined her.

**7. Criminal Law § 5.1— not guilty by reason of insanity—no directed verdict**

A directed verdict of not guilty by reason of insanity would be improper in view of the presumption of sanity and defendant's burden of proof on that

issue even though defendant may have presented uncontradicted testimony as to her insanity at the time of the crime.

8. **Criminal Law § 111— instructions—evidence on post-trial motion for appropriate relief not considered**

Evidence offered on the hearing of a post-trial motion for appropriate relief does not relate back so as to justify a holding that the trial judge erroneously instructed the jury at trial.

9. **Criminal Law § 112.6— insanity—homicide case—instructions not misleading as to possible verdicts**

The trial judge did not leave the jury with the impression that their only verdict choices were not guilty by reason of insanity or guilty of first degree murder when he instructed in the final mandate that the jury could return a verdict of first degree murder "if you have not previously found [defendant] insane at the time of the alleged shooting" but failed to include such an instruction in the final mandate as to the lesser included degrees of homicide, where the jury was fully instructed that if they found that defendant was not insane at the time of the shooting, they must determine whether she was guilty of first degree murder or some lesser included offense of homicide, and the jury was given a written list of the issues and the possible verdicts.

10. **Criminal Law §§ 86.5, 102.5— cross-examination of defendant—impeachment— shooting of person in Florida—not guilty by reason of insanity—prosecutor's withholding of PIN report—absence of prejudice**

In the trial of defendant for first degree murder of her sister, the State was entitled to cross-examine defendant for impeachment purposes as to whether she shot and killed a person in Florida in 1973 even if defendant was found not guilty by reason of insanity of a homicide charge arising out of the shooting; furthermore, defendant was not prejudiced by the prosecutor's failure to disclose that, during the cross-examination of defendant, he received a PIN report indicating that defendant had been found not guilty in the 1973 Florida case by reason of insanity, since this information did not affect the right of the prosecutor to cross-examine defendant about the Florida shooting, and the PIN report itself furnished the prosecutor a sufficient good faith basis for his questions to defendant.

Justice COPELAND dissenting.

Justices EXUM and CARLTON join in the dissenting opinion.

APPEAL by defendant from *Long, Judge.* Judgments entered on 4 May 1979 and 8 July 1979 in Superior Court, DAVIDSON County. This case was argued as No. 116 at the Fall Term 1979.

On 18 May 1977 defendant was arrested upon a warrant charging her with the murder of her sister, Minnie Lee Kiger, on 17 May 1977. Minnie Lee Kiger died at 6:30 a.m. on 18 May 1977 as a result of multiple gunshot wounds to the chest and abdomen inflicted upon her at 8:00 to 9:00 p.m. on 17 May 1977.

On 19 May 1977 appointed counsel filed a motion suggesting defendant's mental incapacity to proceed to trial, and on that same date, defendant was committed to Dorothea Dix Hospital for observation and a determination of her mental capacity to proceed to trial. After it was determined that defendant was mentally competent to proceed to trial she was returned to the custody of the Sheriff, Davidson County.

On 16 August 1977 appointed counsel filed notice of intent of the defendant to rely on the defense of insanity at the time of the alleged offense. At the September 1977 Session of Superior Court, Davidson County, the grand jury returned a bill of indictment charging defendant with the first degree murder of her sister, Minnie Lee Kiger, on 17 May 1977.

At the 2 November 1977 Session defendant was brought to trial at which time she entered a plea of not guilty by reason of insanity. During the course of the trial, upon motion of defense counsel, Judge Rousseau ordered a mistrial.

Defendant was again brought to trial at the 12 December 1977 Session at which time she again entered a plea of not guilty by reason of insanity. The jury found defendant guilty of first degree murder and a sentence of life imprisonment was imposed by Judge Mills. Upon appeal this Court in *State v. Leonard*, 296 N.C. 58, 248 S.E. 2d 853 (1978) ordered a new trial for error in denying defendant's challenge for cause to the three jurors. This opinion was certified to the Superior Court on 18 December 1978.

Again on 19 December 1978 appointed counsel filed a motion suggesting defendant's mental incapacity to proceed. She was committed to Dorothea Dix Hospital for observation and evaluation. On 13 February 1979 the hospital notified the court that defendant had been found competent to proceed to trial, and she was returned to the custody of the Sheriff, Davidson County.

On 30 April 1979 defendant filed a motion to dismiss the charges against her on the ground that she had been denied a speedy trial. This latter motion was filed on the first day of the Session during which defendant was again tried for first degree murder. The motion to dismiss was denied by Judge Long on 1 May 1979.

State v. Leonard

At trial the evidence for the State tended to show the following: On 17 May 1977 at about 8:00 to 9:00 p.m. defendant drove to the home of the deceased, defendant's sister. As deceased walked out of the house and was approaching defendant's automobile which was parked in the driveway, defendant stepped out of her car and shot deceased five or six times with a .22 cal. rifle. Defendant then backed out of the driveway and drove away. It was stipulated by and between the prosecuting attorney and the attorney for the defendant, that Minnie Lee Kiger died as a result of multiple gunshot wounds in the chest and abdomen fired from a .22 cal. rifle. When defendant was arrested at about midnight she was not interrogated. However, after being transported to the sheriff's office, she asked the officer two questions: (1) "How many times did I shoot her?" and (2) if the State still had the death penalty.

At trial the defendant's evidence tended to show the following: Defendant had a long history of mental disturbances. She heard and talked with numerous voices, God, Satan, thunder, and others. The voices, including God and Satan, sometimes told her what to do, and on occasion inflicted physical injury to her, such as cutting her and sticking her on the inside. At the time of the shooting of her sister, God told her to do it. Through the testimony of psychiatrists and others, defendant offered evidence that in 1972 she was diagnosed as chronic undifferentiated schizophrenic; that she knew she was shooting the gun and knew it was harmful; that as a result of her mental illness, she was not able to distinguish between right and wrong; and, that she believed what she was doing was right. Defendant's evidence also tended to establish that she had previously been confined to mental institutions in Florida and North Carolina.

The jury answered two special issues, finding (1) that defendant shot and killed Minnie Lee Kiger on 17 May 1977 and (2) that defendant was not insane at the time of the shooting. The jury thereafter returned a verdict of guilty of first degree murder. Judgment of imprisonment for life was entered on 4 May 1979, and defendant gave notice of appeal.

After judgment was entered, defendant in apt time filed a motion for appropriate relief in the form of a new trial alleging errors committed during the trial. Defendant further alleged

misconduct on the part of the prosecuting attorney in withholding from the court and defendant information in the possession of the prosecuting attorney that defendant had been acquitted of a charge of murder in the State of Florida on the grounds of insanity. On 8 July 1979, after a plenary hearing, the trial judge denied defendant's motion for a new trial. From this latter order, defendant gave notice of appeal.

*Attorney General Edmisten, by Assistant Attorney General Jane Rankin Thompson for the State.*

*R. B. Smith, Jr. for the defendant.*

BROCK, Justice.

## APPEAL CONCERNING THE TRIAL PROCEEDINGS

Defendant's first assignment of error reads as follows: "The trial court erred in denying the defendant's motion to dismiss all charges based on the State's failure to provide the defendant a speedy trial in violation of her Constitutional rights <u>and in failing to provide the defendant a trial free from prejudicial error.</u>" (Emphasis ours.)

The latter portion of the defendant's first assignment of error (underlined above) is broadside and presents nothing for review. It will therefore be disregarded.

[1] The remaining part of assignment of error No. 1 asserts that defendant's constitutional right to a speedy trial has been denied. However in her brief, defendant fails to argue or cite any constitutional principle or authority supporting this assignment of error. Instead she argues that she is entitled to dismissal due to the prosecution's violation of North Carolina General Statute 15A-701(a)(5). Assuming arguendo that the assignment of error supports the argument brought forward, defendant's reliance on the statute is nonetheless misplaced. G.S. 15A-701, the statute itself, which became effective 1 October 1978, exempts this defendant from its application with the following words: "This act shall apply to any person who is arrested, served with criminal process, waives an indictment, or is notified pursuant to G.S.

15A-630 that an indictment has been filed with the superior court against him, *on or after October 1, 1978*." Session Laws 1977, c. 787, p. 2. Defendant was arrested 18 May 1977; a true bill of indictment was returned in September 1977; and defendant was first placed on trial in November 1977, all well before the effective date of G.S. 15A-701.

[2] We also note that defendant has not been denied her constitutional right to a speedy trial. In *State v. Spencer*, 281 N.C. 121, 124, 187 S.E. 2d 779 (1972) this Court held that "whether defendant has been denied the right to a speedy trial is a matter to be determined by the trial judge in light of the circumstances of each case . . . . The constitutional right to a speedy trial prohibits arbitrary and oppressive delays by the prosecution. (Citations omitted.) But this right is necessarily relative and is consistent with delays under certain circumstances. (Citations omitted.)" It is apparent from the history of defendant's involvement in this case, that the courts and the mental institutions of this State have been most generous with their time and facilities in according to her all reasonable protections. Defendant's first assignment of error is overruled.

[3] Defendant next brings forward in one argument her assignments of error Nos. 2 and 8. In these assignments defendant contends the trial court erred in allowing the State to introduce evidence of statements made by the defendant to the arresting officers after the defendant refused to sign a waiver of her constitutional rights. At trial, upon defendant's objection to any of these statements being introduced into evidence, an evidentiary hearing was conducted in the absence of the jury. On voir dire the State's evidence tended to show the following: When defendant was arrested at her home she was advised of her constitutional rights but was not interrogated and she made no statement. After she was transported to the Sheriff's office she was again advised of her constitutional rights and was asked to sign a waiver which she refused to do. She was not interrogated, but while waiting to be formally served with a warrant and transported to a jail cell defendant asked the arresting officer: "How many times did I shoot her?" She also asked the officer if the State still had the death penalty. The officer did not respond to either question. After the voir dire Judge Long found that defendant was advised of her *Miranda* rights and that the two

questions asked by defendant were not in response to interrogation but were volunteered by defendant and were admissible in evidence. The testimony of the officer relating the two questions asked by defendant were thereafter admitted before the jury in the State's case in chief.

Defendant argues that it was error for the trial judge to refuse to hear from defendant's witnesses (including psychiatrists) upon the question of defendant's mental competence to understand the nature and gravity of her statements. She further argues that it was error to admit the statements into evidence without first making a determination of her mental competence to understand the nature and gravity of those statements. Defendant cites numerous cases which support the proposition that a determination of the defendant's mental competence as it bears upon the voluntariness of her confession must be made prior to admitting into evidence her confession obtained through custodial interrogation. *See State v. Ross*, 297 N.C. 137, 254 S.E. 2d 10 (1979); *State v. Whittemore*, 255 N.C. 583, 122 S.E. 2d 396 (1961). These cases, however, are inapposite to the factual situation presented in the present case. In *Ross* and *Whittemore* the defendants' incriminating statements (*i.e.*, confessions) were made in response to custodial interrogation. An interrogation of the defendant in this case is not in issue, for there was no interrogation. Therein lies the difference. *See Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2d 242 (1960). In the case *sub judice* the first question asked by the defendant, as to how many times she shot her sister, is merely a question asked upon the sole initiative of the defendant. Also the question concerning the death penalty was asked upon the sole initiative of the defendant. Notwithstanding the defendant's claim of insanity, the State may offer, without a preliminary inquiry into defendant's mental competence, testimony describing the defendant's acts in shooting the deceased and fleeing the scene. In a like manner the State may offer testimony describing the defendant's other self-initiated acts, statements and questions, without a preliminary inquiry into defendant's mental competence, so long as they are relevant to an issue under inquiry. Any intimation to the contrary in *State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975) is disapproved. The evidence proffered by defendant on voir dire would have been ap-

propriate before the jury for its determination of the credibility of the confession, but not upon the question of its admissibility.

This argument by defendant on the admissibility of her confession strays far from the real issue in this case. There were two eyewitnesses to the shooting; defendant admitted the shooting to her psychiatrists; defendant testified at trial that she shot her sister; and the murder weapon was in her possession. The basic and real contested issue in this case is whether defendant was insane at the time she shot her sister, not whether she shot her. Assignments of error Nos. 2 and 8 are overruled.

[4] By her third assignment of error defendant argues that the trial judge erred in denying defendant's motion to dismiss all charges made at the close of the State's evidence. After the denial of her motion, defendant proceeded to offer evidence. Having elected to offer evidence defendant waived her motion to dismiss at the close of the State's evidence, and proper consideration is thereafter upon her motion to dismiss made at the close of all the evidence. G.S. 15-173; *accord, State v. Davis*, 282 N.C. 107, 113, 191 S.E. 2d 664, 668 (1972); *State v. Jones*, 296 N.C. 75, 77, 248 S.E. 2d 858, 859 (1978). The provisions of G.S. 15A-1227 do not alter this salutary and long standing rule in North Carolina. In any event, defendant's motion to dismiss was properly denied as the State's evidence, by way of the testimony of two eyewitnesses, when viewed in the light most favorable to the State, is clearly ample to support a verdict of guilty of first degree murder. *See State v. Haywood*, 295 N.C. 709, 717, 249 S.E. 2d 429, 434 (1978). Defendant's third assignment of error is overruled.

[5] Defendant brings forward in one argument her assignments of error Nos. 4 and 7. On cross-examination of defendant, the prosecutor was permitted, over objections, to question defendant concerning her prior conduct in the shooting and killing of Nellie Somner in the State of Florida in 1973. The use of this evidence was restricted by the trial judge for impeachment purposes, and for the purpose of identification, and he so instructed the jury. Defendant argues that both the admission of the evidence and the court's instruction to the jury constituted error.

Defendant argues that the evidence of the homicide in Florida was inadmissible for impeachment purposes. She contends that since she was found not guilty by reason of insanity in the

Florida case, that such a determination alleviated her from all criminal responsibility for the Florida homicide. However defendant's argument for exclusion of this evidence is premised upon an alleged determination of insanity in the Florida proceedings. From the record on appeal, we note that the only evidence concerning the Florida proceedings which was before the trial judge when defendant objected to the introduction of this evidence was defendant's self-serving and partly hearsay testimony obtained during the voir dire examination. Defendant stated on voir dire that she shot Nellie Somner on May 15, 1973; that she was not convicted of killing Nellie Somner; that *they said* she was temporarily insane; that they put her back in the hospital and then the doctor let her go. The defendant's hearsay testimony on voir dire is not adequate evidence upon which the trial judge could make a ruling that defendant had in fact, in the Florida case, been found not guilty by reason of temporary insanity. The records in the Florida case were available to defendant at the time of trial, and if they supported her present assertion, should have been secured and offered in evidence on the voir dire.[1]

Although a defendant, for impeachment purposes, may not be asked if he had been accused, arrested or indicted for a particular crime, he may be asked if he in fact committed the crime so long as the question is asked in good faith. In controlling the scope of such cross-examination, the trial judge has wide discretion, and his ruling should not be disturbed except when prejudicial error is disclosed. *State v. Mayhand*, 298 N.C. 418, 427, 259 S.E. 2d 231, 237 (1979) and cases cited therein. In our view the trial judge properly permitted cross-examination of defendant for impeachment purposes concerning whether she in fact shot Nellie Somner in Florida in 1973.

It is not clear why the evidence of the 1973 Florida homicide was also admitted for the purpose of identification. There was absolutely nothing in the evidence which tended to identify defendant as the one who shot Nellie Somner in Florida in 1973. However, although error, its admission for this purpose is clearly harmless beyond a reasonable doubt in the light of the identifica-

---

1. Failure of the district attorney to disclose to defense counsel and the court information concerning defendant's acquittal from the Florida charges on the grounds of insanity, is discussed in defendant's appeal concerning the trial court's denial of her motion for appropriate relief, *infra*.

tion of defendant by her niece and her nephew as the person who shot Minnie Lee Kiger; defendant's testimony that God told her to shoot her sister, Minnie Lee Kiger; and that when she shot her sister she believed what she was doing was right. Defendant's assignments of error Nos. 4 and 7 are overruled.

[6] In her fifth assignment of error defendant argues that the trial judge also committed error in allowing the prosecutor to cross-examine the defendant about other specific acts of misconduct (along with questions about the 1973 Florida homicide). It is well-established in this State that when a defendant elects to testify in his own behalf, he is subject to cross-examination, for purposes of impeachment, with respect to prior specific criminal acts or degrading conduct for which there has been no conviction. *State v. Ross*, 295 N.C. 488, 490, 246 S.E. 2d 780, 783 (1978); *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975); *see* Stansbury's N.C. Evidence (Brandis Rev.) § 108 (1973). Defendant concedes this rule; however, she argues in this case that her long history of mental disease negates the impeachment value of such questions for such medical history shows that she was not mentally responsible for her prior acts of misconduct. The defect in defendant's argument is that although her evidence shows that she is now diagnosed as chronic undifferentiated schizophrenic, it also shows that such a mental disorder does not always prevent her from knowing right from wrong, nor does the evidence show that her mental disorder always prevents her from knowing the nature and quality of her acts. In fact, one of her psychiatrists stated: "It is my opinion that on the day of May 17, 1977 (the date of the Minnie Lee Kiger shooting) there was a period of time during that day that she was capable of distinguishing the difference between right and wrong . . . ." The expert testimony of Dr. Billy W. Royal and Dr. Bob Rollins, offered by the defendant, established that with her type of mental disorder, there were periods of time when the defendant knew right from wrong, and times when the defendant understood what was going on around her. Assuming arguendo the validity of defendant's argument for exclusion of evidence of prior acts for impeachment purposes where such acts were committed at a time when defendant did not know right from wrong, nevertheless since there was no evidence of defendant's inability to distinguish right from wrong at the specific times of her prior acts of misconduct about which the prosecutor

cross-examined her, such questions were proper for impeachment purposes. Defendant's fifth assignment of error is overruled.

[7]   In her sixth assignment of error defendant argues that it was error to deny her motion for a directed verdict of not guilty at the close of all of the evidence. This motion accompanied the defendant's motion to dismiss for insufficiency of the evidence, and was a motion for a directed verdict of not guilty by reason of insanity. Defendant argues that her presentation of expert testimony of her insanity at the time of the shooting of her sister overcame the presumption of sanity since the State offered no direct testimony to the contrary.

This argument was clearly addressed and overruled by this Court in defendant's former appeal. Justice Britt, speaking for the Court stated:

> "We have repeatedly held, and we again reiterate the rule, that the burden of proving insanity is properly placed on the defendant in a criminal trial. Furthermore, a defendant must establish his insanity to the satisfaction of the jury if it is to provide a defense to a criminal charge. (Citations omitted.) The correctness of this rule is reinforced by the holding of the Supreme Court of the United States in *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed. 2d 281 (1977). There the court held that placing the burden on the defendant of proving the defense of extreme emotional disturbance as defined by New York law did not violate the Due Process Clause of the Fourteenth Amendment to the United States' Constitution. We likewise find that no unconstitutional burden is imposed upon defendants by the requirement of North Carolina law which compels them to prove the defense of insanity.

> Defendant's argument fails to take into account the effect which placing the burden of proving insanity upon the defendant has on the presumption of sanity. '. . . [T]he prosecution may assume, as the law does, that the defendant is sane. The assumption persists until challenged and the contrary is made to appear from circumstances of alleviation, excuse, or justification; and it is incumbent on the defendant to show such circumstances to the satisfaction of the jury, unless they arise out of the evidence against him. (Citation

omitted.) If no evidence of insanity be offered, the presumption of sanity prevails. And where the defendant offers evidence of his insanity, the state may seek to rebut it or to establish the defendant's sanity *by the presumption of law, or by the testimony of witnesses, or by both* (emphasis added).' (Citation omitted.) Even if the evidence of insanity presented by the defendant is uncontradicted by the state, it is the defendant's burden to satisfy the jury of the existence of the defense. The credibility of the defense witnesses in this case was a proper matter for the jury. A diagnosis of mental illness by an expert is not in and of itself conclusive on the issue of insanity." (Citations omitted.) *State v. Leonard*, 296 N.C. 58, 64-65, 248 S.E. 2d 853, 856-57 (1978).

"The burden of this plea (of insanity) is upon the defendant . . . to show it to the satisfaction of the jury." (Citation omitted.) *State v. Cash*, 219 N.C. 818, 822, 15 S.E. 2d 277, 279 (1941). *See also* 4 Strong's North Carolina Index 3d, Criminal Law § 5.1, and cases cited in note 81. In view of the presumption of sanity and this Court's holdings that the question of sanity is one for the jury, a directed verdict of not guilty by reason of insanity would be improper. Defendant's sixth assignment of error is overruled.

[8] By her ninth assignment of error, defendant argues that based upon evidence presented by defendant on her motion for appropriate relief, the trial judge committed error in instructing the jury on the presumption of sanity and that defendant had the burden to prove her insanity at the time of the offense charged. Without, at this time, discussing the evidence offered by defendant on her motion for appropriate relief we hold that this assignment of error is without merit for the following reasons.

The evidence in this case was completed, counsel argued the case to the jury, the trial judge instructed the jury, and the jury returned its verdict of guilty on 4 May 1979. Judgment was entered and commitment was issued on 4 May 1979. On 14 May 1979 defendant filed her motion for appropriate relief. Defendant's motion for appropriate relief was heard by Judge Long (the trial judge in this case) beginning on 1 June 1979. If defendant is entitled to relief by reason of evidence offered by her in June 1979 it is by an order for appropriate relief entered upon that hearing. Evidence (even if otherwise convincing) offered

almost a month after the trial had concluded does not relate back so as to justify a holding that the judge erroneously instructed the jury at trial. Defendant's ninth assignment of error is overruled.

[9]  By her tenth assignment of error defendant contends that the trial court erred when instructing the jury on what degrees of homicide were returnable by not stating that these verdicts were returnable "if you [the jury] have not previously found her [the defendant] insane at the time of the alleged shooting." The trial court did include this instruction in its final mandate on first degree murder but did not include it in its final mandate as to the lesser included degrees of homicide. The defendant argues that this omission may have confused the jury and left them with the impression that their only choices were not guilty by reason of insanity or guilty of first degree murder. We disagree.

The court instructed the jury that they must first determine if the defendant shot and killed Minnie Kiger. If they answered in the affirmative, they must then determine whether the defendant was insane at the time of the shooting. At this point the jury was fully instructed on the law concerning the insanity defense. The court then charged that if they found the defendant was *not* insane at the time of the shooting, they must determine whether she was guilty of first degree murder or some lesser included homicide offense. The court charged:

> "So, if you find she was not insane, you would consider whether she may be guilty of first-degree murder, or guilty of second-degree murder, or guilty of voluntary manslaughter, or guilty of involuntary manslaughter, or not guilty."

Later the court reiterated:

> "Members of the Jury, if you don't find the defendant insane at the time of the alleged shooting, you must consider whether she may be guilty of a homicide offense. Under the law and evidence in this case it will be your duty, if you find the defendant not insane, to return one of the following verdicts: either guilty of first-degree murder, or guilty of second-degree murder, or guilty of voluntary manslaughter, or guilty of involuntary manslaughter, or not guilty."

Finally, the jury was given a sheet of paper listing the two issues: (1) Did the defendant shoot and kill Minnie Lee Kiger? and (2) If so, was the defendant insane at the time of the shooting? The jury was also given a list of all possible verdicts. Viewing the charge as a whole, as it must be, *Beanblossom v. Thomas*, 266 N.C. 181, 189, 146 S.E. 2d 36, 42 (1966), the jury clearly understood all possible verdicts including not guilty by reason of insanity. Defendant's tenth assignment of error is overruled.

By her eleventh and twelfth assignments of error defendant contends that the trial court erred in denying her motion to set the verdict aside and her motion in arrest of judgment. Each of these motions was based upon alleged error heretofore discussed. Based upon our resolution of defendant's foregoing ten assignments of error, the eleventh and twelfth are overruled, also.

In our consideration of the assignments of error to the trial proceedings in May 1979, we find no prejudicial error.

APPEAL CONCERNING THE MOTION FOR APPROPRIATE RELIEF

Defendant's remaining assignments of error are addressed to alleged error in the hearing and resolution of her motion for appropriate relief heard by Judge Long in June 1979.

The first four grounds for relief alleged in defendant's motion were also subjects of her assignments of error heretofore discussed in connection with her appeal concerning the trial proceedings. We will not discuss them again. We affirm Judge Long's denial of relief upon each of these first four alleged grounds.

[10] The fifth alleged ground for relief is set out in defendant's motion as follows:

"5. The District Attorney, during the course of the trial which began May 1st, 1979 and prior to the submission of the case to the jury had information that the defendant, Peggy Massey Leonard, had been found not guilty by reason of insanity of the killing of Nellie Somner in Polk County, Florida, on March 14th, 1973, and for this reason the defendant did not receive a fair and impartial trial."

The point in question relates to the propriety of the prosecutor's cross-examination of defendant about her alleged killing

of a woman in Florida in 1973, and the failure of the prosecutor to timely disclose to the court and defense counsel, information that defendant was found not guilty of that offense by reason of insanity.

When defendant was first tendered for cross-examination, the prosecutor asked her if she had been admitted to a mental hospital in Florida in 1973 for six or seven months. Without objection she answered that she had been. She was then asked, "[w]hy were you in that hospital?," and she replied: "They said I killed a woman." Defense counsel objected to the answer and moved to strike. The court overruled the objection, but instructed the jury not to consider "what they said she did." The court advised the prosecutor "you may examine her concerning any specific conduct." Defendant was then asked if she killed a woman. Defense counsel's objection to the question was overruled but his request for a voir dire was granted.

Pursuant to questioning by the prosecutor in the absence of the jury, defendant testified that she shot Nellie Somner on 15 May 1973; that "they said I was temporarily insane. After I came out of the hospital I wasn't convicted. They let me go. They put me back in the hospital and then the doctor let me go." In response to a question from the court, the prosecutor stated that he wished to introduce the evidence relating to the Florida killing for the purpose of impeachment "by specific act of misconduct." The court overruled defendant's objections, and allowed the defendant's testimony to be considered by the jury. The court also refused to recognize defendant's continuing objection to the "whole line of questions," and advised counsel to "bring my attention to the objectionable questions as they arise."

Following the voir dire, over objection, defendant testified on cross-examination that she pulled a gun on a woman in Florida and that woman was Nellie Somner. Defendant's *unobjected to* cross-examination is summarized in pertinent part as follows: The shooting of Nellie Somner took place in 1973. Prior to the shooting, defendant had worked with Nellie Somner in a beauty shop. At the time of the shooting, defendant and Nellie Somner were by themselves in an automobile. Defendant does not remember firing any shots but she remembers the gun being in her hand and hearing more than one shot. After the Somner

shooting, defendant was put in a mental hospital in Florida where she remained for six or seven months. After that time, she was released without ever being tried for any offense related to the shooting. Prior to the Somner shooting, and while she was in Florida in 1973, she shot at her then husband, James Masterson, because he was "going to rape me." She shot at Masterson with the same .22 pistol she had in her hand when Nellie Somner was shot.

It is settled law in this jurisdiction that for purposes of impeachment, it is permissible to cross-examine a witness, including the defendant in a criminal action, by asking disparaging questions concerning collateral matters relating to his criminal and degrading conduct, so long as the questions are asked in good faith. *State v. Williams*, 279 N.C. 663, 675, 185 S.E. 2d 174, 181 (1971), and cases cited therein.

It is true that in *Williams*, this Court held that for purposes of impeachment, a witness may not be asked if he has been *arrested* or *indicted* for a specified offense. "However, the decision in *Williams* did not change the rule that for purposes of impeachment a witness may be asked whether he has *committed* specific criminal acts or been guilty of specified reprehensible conduct. (Citations omitted.)" *State v. Gainey*, 280 N.C. 366, 373, 185 S.E. 2d 874, 879 (1972). Also, in *State v. Herbin*, 298 N.C. 441, 451, 259 S.E. 2d 263, 270 (1979), this Court speaking through Justice Copeland held that it is permissible to cross-examine a defendant about a specific act of misconduct even though he has been acquitted of the charge, provided the questions are asked in good faith.

In the present case we hold the prosecutor was entitled to cross-examine defendant about the Somner shooting. The questions were properly directed at matters within the defendant's own personal knowledge and were solely intended to elicit information of a specific prior act of degrading conduct. *See State v. Williams, supra.*

In *State v. Purcell*, 296 N.C. 728, 732-33, 252 S.E. 2d 772, 775 (1979), Justice Exum writing for the Court noted:

> ". . . a criminal defendant who takes the stand may be cross-examined for purposes of impeachment concerning any prior specific acts of criminal and degrading conduct on his part.

*Such acts need not have resulted in a criminal conviction to be appropriate subjects for inquiry. . . .* (Emphasis ours.)

The purpose of permitting inquiry into specific acts of criminal or degrading conduct is to allow the jury to consider these acts in weighing the credibility of a witness who has committed them."

Here, even though the defendant's shooting of Nellie Somner did not result in a criminal conviction, the shooting clearly constituted prior degrading conduct, and was a proper subject of cross-examination. We will now address the facts developed at the post-trial hearing on defendant's motion for appropriate relief.

At the hearing, defendant presented evidence tending to show that prior to the cross-examination of defendant, the trial judge preliminarily ruled that if defendant had been tried upon a homicide charge in Florida, and found not guilty by reason of insanity, the State would not be allowed to bring the Florida homicide to the attention of the jury. Evidence was also presented, showing that prior to the cross-examination, defendant's counsel had asked the district attorney to reveal to him any information he had regarding the alleged Florida homicide and that shortly after the prosecutor began his cross-examination of defendant, he received a PIN (Police Information Network) report disclosing that in the Somner homicide case in Florida, defendant was found not guilty by reason of insanity. Further evidence introduced at the hearing showed the prosecutor did not disclose information concerning defendant's acquittal to the court or defense counsel until four days after the trial. Certified copies of the Florida court records presented at the hearing, showed that the homicide charge against defendant was dismissed on the grounds of her insanity.

The rule in this jurisdiction is that the prosecutor must act in good faith in his cross-examination of a defendant about prior specific acts of misconduct. That is to say, the prosecutor must have a reasonable and sufficient basis for his belief that defendant committed the specific act of misconduct before he may properly cross-examine a defendant concerning such act of misconduct. Otherwise a prosecutor conceivably could ask a defendant about any act of misconduct which the prosecutor decides to ask whether it has any basis in reality or is only a fig-

ment of imagination. Such unfounded cross-examination of a defendant must not be permitted, as its unfairness and prejudice to a defendant is obvious. Therefore bad faith in this fashion on the part of a prosecutor requires a new trial because of prejudice to the defendant.

In the case now being considered the defendant would have us extend the "good faith" rule to the conduct of the prosecutor. This we refuse to do for the PIN report provided the prosecutor sufficient basis for his questions to the defendant. The trial judge so found following the post-trial hearing.

We are unable to perceive how defendant was prejudiced by failure of the prosecutor to disclose the PIN report at the time he received it. Under the rule in *Williams*, the prosecutor still could have asked defendant about the Florida homicide since he did not ask her if she had been arrested or indicted for that offense. The only possible benefit defendant could have received from the report was to corroborate her statement that following the shooting and after her confinement in a mental hospital for six or seven months, she was released without ever being tried for any offense related to the shooting. Her statement was not challenged in any way and there is no reason to believe that the jury did not accept it at face value.

Defendant has been placed on trial three times for the merciless killing of her sister, in her sister's own yard and in the presence of her sister's two children. For reasons that do not appear in the record the first trial ended in a mistrial. The second trial resulted in a verdict of guilty of first degree murder and a judgment of life imprisonment. This Court found error in that trial and ordered a new trial because the trial court denied defendant's motion to excuse for cause three prospective jurors who indicated that they would not be willing to return a verdict of not guilty by reason of insanity even though defendant presented evidence that would satisfy them that she was insane at the time her sister was killed. At the third trial, a jury, about which defendant voices no complaint, found defendant guilty of first degree murder and the court again entered judgment imposing a life sentence.

Certainly, considerable weight should be given to the trial judge's findings and conclusions on defendant's post-trial motions.

He had witnessed every minute of the trial, had observed the demeanor of the witnesses, including defendant, and had the "feel" of the case in general. After patiently listening to evidence and arguments presented at the hearing on the post-trial motions, including a motion for a new trial, he concluded that the verdict and judgment should stand. We agree with that conclusion. "Every person charged with crime is 'entitled to a fair trial but not a perfect one.' *Lutwak v. United States*, 344 U.S. 604, 97 L.Ed. 593, 73 S.Ct. 481 (1953)." *State v. Tolley*, 290 N.C. 349, 373, 226 S.E. 2d 353, 371 (1976).

While we ordinarily would be strongly inclined to publicly censure the prosecutor in this case for his conduct in deliberately attempting to frustrate a preliminary ruling of the trial judge, nevertheless we will not do so for the following reason. The trial judge, who presided at both the trial and the post-trial proceedings had a view as clear, and probably clearer, as we can have from the cold record. He did not see fit to initiate any disciplinary action against the prosecutor and we will defer to his handling of the matter.

Although we do not agree with all of the reasons given by Judge Long in Section #1 of his order denying the motion for appropriate relief, we nevertheless agree that the cross-examination of the defendant with respect to her conduct in the shooting of Nellie Somner in Florida in 1973 is competent for the purposes of impeachment under the prevailing rules in this jurisdiction.

In our consideration of the assignments of error to the post-trial proceedings in June 1979, we find no prejudicial error.

No error.

Justice COPELAND dissenting.

The majority holds that defendant could be cross-examined during trial about "her prior conduct in the shooting and *killing* of Nellie Somner in the state of Florida in 1973" (emphasis added) even though she had been found not guilty by reason of insanity in that case and even though the trial judge in this case had ordered the prosecutor not to ask about any prior killings by the defendant for which she had been found not guilty by reason of insanity. The majority so holds because there was not, during

trial, "adequate evidence upon which the trial judge could make a ruling that defendant had in fact, in the Florida case, been found not guilty by reason of temporary insanity."

After trial, defendant moved for appropriate relief when she learned that the assistant district attorney had received a PIN report during the cross-examination of the defendant which revealed that she had been found not guilty by reason of insanity in the Florida case. The majority upholds the denial of defendant's motion for appropriate relief because "criminal and degrading conduct [may be asked about on cross-examination] . . . even though [defendant] . . . has been acquitted of the charge, provided the questions are asked in good faith."

I respectfully dissent because whether the question concerns a prior conviction, a prior act of misconduct for which there has been an acquittal as in *State v. Herbin*, 298 N.C. 441, 259 S.E. 2d 263 (1979), or a prior act of misconduct which has not been the basis for a criminal prosecution, the conduct must be *mis*conduct, i.e., *wrongful*. The questioning in this case did not concern a prior act of *mis*conduct for two reasons. First, the questioning was about a prior killing, and second, defendant was found to be insane at the time of that killing.

In ignoring the first of these two points, the majority's holding is squarely in conflict with our decision last term in *State v. Purcell*, 296 N.C. 728, 252 S.E. 2d 772 (1979). There we held it to be prejudicial error for the State to ask the defendant on cross-examination, "You have *killed* somebody haven't you, Mr. Purcell?" and "Well, it was known all around town that you had *killed* somebody weren't it?" (Emphasis added.) In so holding, Justice Exum writing for the Court stated that,

> "The purpose of permitting inquiry into specific acts of criminal or degrading conduct is to allow the jury to consider these acts in weighing the credibility of a witness who has committed them. For this purpose to be fulfilled, the questions put to the witness must enlighten the jury in some degree as to the nature of the witness' act. Questions so loosely phrased as the one here give the jury no clear indication about the witness' credibility. *Under our law and the mores of our society, killing is not categorically wrong.* As the Arkansas Supreme Court said when confronted with a

similar issue in *Stanley v. State*, 171 Ark. 536, 537, 285 S.W. 17, 18 (1926): 'A homicide is not necessarily a crime. The killing may have been an accident or entirely justifiable.' Indeed, a soldier who kills the enemy in war may be thought a hero. *When a question is put to a witness about some prior act for the purpose of impeaching his credibility, and the question does not show by its phrasing that the act was wrongful, an objection to it should be sustained."* Id. at 733, 252 S.E. 2d at 775 [Emphasis added].

With regard to the second point, the rule is that, on cross-examination when defendant has not placed his character in issue, he may be asked, for purposes of impeachment, about any specific acts of misconduct which tend to impeach his character. *State v. Herbin, supra; State v. Purcell, supra; State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated*, 429 U.S. 912 (1976); *State v. Hartsell*, 272 N.C. 710, 158 S.E. 2d 785 (1968). Of course, the misconduct does not have to be criminal. It includes any specific bad acts which tend to impeach defendant's character. 1 Stansbury's N.C. Evid. § 111, notes 9, 11 and 12 (Brandis Rev. 1973 and Cum. Supp. 1979) and the numerous cases cited therein.

The purpose for asking defendant about prior specific acts of misconduct is to impeach his *character*. Therefore, the act must have been one which reflects on his character by being morally and/or legally wrong. *Id.* The act must have been wrongful. *State v. Purcell, supra.*

The very definition of misconduct also makes this point clear:

"Misconduct. A transgression of some established and definite rule of action, a forbidden act, *a dereliction from duty, unlawful behavior, willful in character, improper or wrong behavior*; its synonyms are misdemeanor, misdeed, misbehavior, delinquency, impropriety, mismanagement, offense. . . ." Black's Law Dictionary (5th ed. 1979), p. 901. [Emphasis added.]

As the majority states the rule, criminal or degrading conduct may be asked about. By definition degradation means,

"A deprivation of dignity; dismissal from rank or office; act or process of degrading. *Moral or intellectual decadence;*

degeneration; deterioration." Black's Law Dictionary (5th ed. 1979), p. 381. [Emphasis added.]

An insane person cannot be held accountable for his actions because, by definition, he knows not the difference between right and wrong. Surely, defendant could be confined for *treatment*, but the law and society do not hold her legally or morally accountable and seek to punish her for any wrongdoing.

The majority does not base its decision on questioning about a prior conviction since defendant was found not guilty by reason of insanity. The majority holds that even though she was acquitted of the charge, it was still an act of misconduct that she could be questioned about citing *State v. Herbin, supra.* In *Herbin* we did hold that the defendant could be asked if he had in fact raped one Virginia Pearson even though he had been acquitted of rape and convicted of the lesser offense of assault on a female. However, rape is wrongful and illegal conduct for which the defendant could be held accountable to society and the law. Thus, there was misconduct in *Herbin* but there is not in the case *sub judice.* Therefore, *Herbin* is not supportive of the majority's holding in this case. Since defendant was found to be insane at the time of the killing in Florida and since the questioning was phrased in terms of a prior killing, we do not have a prior specific act of misconduct (wrongdoing) that was a proper subject of inquiry on cross-examination.

Asking about the incident was most certainly prejudicial to defendant, *State v. Purcell, supra,* because it opened up for possible inquiry by the jury what her culpability was for that Florida killing and whether she was sane or insane at the time. That was an impermissible subject of inquiry for the jury. It prejudiced the defendant because she may have been convicted for the North Carolina killing, whether she was guilty or not, simply because the jury was aware that this was at least the second time such a killing had occurred by her hand and thus she should be incarcerated. Thus, there is a reasonable possibility that had the error not occurred, a different result would have been reached at the trial. G.S. 15A-1443.

The assistant district attorney who prosecuted this case testified during the hearing on the motion for appropriate relief that he had been specifically instructed by the trial judge "that

cross-examination would not be allowed with regard to a prior killing if the person had been found not guilty by reason of insanity." During trial, the trial judge did not know the legal determination in the Florida case because assistant district attorney George Fuller, who came into possession of this information during the cross-examination of the defendant, did not reveal this information (contained in the PIN report) to the trial judge.

The actual determination in the Florida case is a matter of record in this case and is contained in the testimony of assistant district attorney George Fuller given during the hearing on the motion for appropriate relief. He testified that the information on the result of that Florida case was conflicting. He was told at one time that she had been found "not guilty by reason of insanity" and another time he was told that she was "never tried because she was found incompetent to stand trial." He then testified that he received Exhibit A (the PIN report). It revealed that "at one point [she was] hospitalized as being incompetent to stand trial. At a later point, *she was returned for trial and . . . found not guilty by reason of insanity. . . .*" [Emphasis added.] He testified that he came into possession of the PIN report "during the course of the trial after the *voir dire* of the Florida killing shortly in the cross examination of the defendant." Therefore, defendant was in fact found not guilty by reason of insanity in the Florida killing and the assistant district attorney violated the trial judge's instructions on this matter.

I believe that the trial judge was correct in his original instructions to the assistant district attorney during the trial because, as discussed above, the law says that an insane person is not to be held accountable to society for his actions and because the questions were phrased in terms of a prior killing. The assistant district attorney was clearly incorrect in his actions because he violated the trial judge's instructions and, for the reasons discussed above, this action was prejudicial error in the defendant's trial.

If Assistant District Attorney George Fuller had followed the trial judge's instructions during the trial, this error may not have occurred. Whether defendant was sane or insane at the time of the killing in North Carolina, I do not know. My concern is that she have her day in court so that this very issue may be justly

determined by a fair and impartial jury free from prejudicial influences. Defendant, as the majority notes, is not entitled to a perfect trial. However, she is entitled to one that is fair no matter how many times it may take the State to fulfill this requirement. Justice requires a new trial and that is how I cast my vote.

Justices EXUM and CARLTON join in this dissent.