STATE OF NORTH CAROLINA v. JAMES HOWARD ROSS

No. 37

(Filed 20 April 1979)

Criminal Law § 75.14— mental capacity to confess—admission of confession erroneous

The trial court erred in denying defendant's motion to suppress his confession made approximately twenty-four hours after commission of the crime charged where defendant offered evidence that he was mentally incompetent at the time he confessed, such evidence including a history of mental illness

and hospitalization therefor, accounts of strange behavior such as running through the woods without his shirt on when he and his brother attended a baseball game, testimony by defendant's brother that it was necessary to keep a person with defendant because he could not care for himself, and testimony by a psychiatrist that defendant was suffering from schizophrenia and had memory problems and delusions; the State's only evidence with respect to defendant's competence at the time of his confession was the testimony of a deputy sheriff that defendant appeared to be comfortable and that defendant's statements made sense to him; portions of defendant's statements revealed that defendant's story to the deputy sheriff was not logical and sensible; and defendant's confession could not be admitted on the chance that it was made during a lucid interval.

APPEAL by defendant from the judgment of *Herring, J.,* entered in the 14 August 1978 Criminal Session of UNION County Superior Court.

The defendant was charged, in an indictment proper in form, with first degree burglary. On 14 August 1978 he entered a plea of not guilty by reason of insanity.

At trial the evidence for the State tended to show the following:

On 25 June 1978 Joe Hudson, his wife and his son went to bed at approximately 11:00 p.m. Mr. Hudson, who was the last one to retire, testified that the outside doors and the windows were all closed because his house is air conditioned. A short time later, at about 12:30 a.m. on 26 June 1978, Mr. Hudson woke up to the barking of his dog who slept in the bedroom with him and his wife. His wife got up to let the dog out of the room, and he heard her say, "Could I help you?" Mr. Hudson then jumped out of bed, and the defendant was in the hallway of his house. The defendant asked for a drink of water. The two men went into the kitchen, and the defendant drank two glasses of water. Mr. Hudson testified that the defendant was "sweating a good bit" and that he "looked strange."

The defendant and Mr. Hudson went outside, and the defendant started walking away from the house. Mr. Hudson went inside and called the sheriff's office. The defendant came back to the door of the Hudson residence and asked to be let in. Mr. Hudson said no, and the defendant replied, "I'll break in." Mr. Hudson got his shotgun, and the officers arrived a few minutes later.

The officers searched the defendant and found a steak knife in his front pocket. Mr. Hudson identified the knife as belonging to him. The defendant made a formal incriminating statement to the officers at about 11:00 p.m. on 26 June 1978 that was introduced into evidence at trial.

The evidence for the defendant tended to show the following:

Dr. James Groce is a staff psychiatrist at Dorothea Dix Hospital. The defendant was sent to that institution on 29 June 1978, and he was released on 27 July 1978 for trial.

Dr. Groce testified as to what the defendant had told him of his past. The defendant had been admitted to several psychiatric hospitals in the past, primarily in New York. He had recently come to North Carolina where some of his family lives. The defendant had gotten a job at a horse farm in Greensboro for two or three days, but because of a "misunderstanding" he was fired and at the same time was involuntarily committed to John Umstead Hospital in Butner. The defendant was discharged a few days later, and he went to live with his brother in Union County three or four days before the incident in question occurred.

The defendant had told Dr. Groce that on the evening of 25 June 1978, his brother had left him home alone. He was feeling restless and was resentful that his brother was out having a good time. There were two telephone calls, and the defendant became upset and tore the telephone out of the wall. He left the house to go into town; however, he was not certain in which direction or how far away town was. As the defendant was walking along the highway, he began seeing strange lights behind him in the trees, and he felt he was being observed by flying saucers or UFO's. The defendant became hot and tired. He saw a house with some lights on, and he thought the people inside could tell him how to get to town. The door was unlocked, so the defendant walked in. The rest of defendant's story to Dr. Groce was basically the same as Mr. Hudson's account of the events, except that when the police arrived, the defendant was apprehensive. He was uncertain whether the officer was a real policeman or whether he was from outer space.

Based on his observations of and interviews with the defendant at Dorothea Dix Hospital, Dr. Groce testified that he felt the

defendant was suffering from "chronic, undifferentiated schizophrenia." The doctor concluded that in his opinion at the time of the incident in question the defendant "did know the nature of his behavior but did not appreciate the quality of that behavior. . . . [H]e was not able to distinguish right from wrong in the usual sense."

Mr. Ray Flynn, an adult therapist at the Piedmont Area Mental Health Center, testified that on 23 June 1978 the defendant came into the clinic without an appointment. The defendant requested medication and treatment, and an appointment for him to meet with a staff psychiatrist was made for the following week. Mr. Flynn stated that in his opinion the defendant's judgment was "poor" and that "he was suffering from some form of psychosis."

Mr. A. C. Ross, the defendant's brother, testified that he brought the defendant to his home from Greensboro a few days before the defendant was found in the Hudson house. Mr. Ross farmed during the day, but he had a woman come to his home to stay with the defendant while he was working because "I [Mr. Ross] felt that he [the defendant] was in such condition that he simply couldn't look after himself without having somebody watch him."

On 25 June 1978 Mr. Ross took the defendant to a baseball game in Pineville. The defendant would not talk with anyone, and twice he took his shirt off and ran through some woods. The two men went home, and the defendant went to lie down at about 10:00 p.m. at his brother's request. Mr. Ross fell asleep on the couch, and he did not wake up until the police came to his house after they had picked the defendant up at the Hudson residence. Mr. Ross stated that "it looked like he [the defendant] was just off that day [25 June 1978]."

The judge submitted the charges of first degree burglary and nonfelonious breaking or entering to the jury. The jury found the defendant guilty of first degree burglary. After receiving a sentence of life imprisonment, the defendant appealed to this Court.

Other facts relevant to the decision will be included in the opinion below.

*L. K. Biedler, Jr. and James C. Fuller, Jr. for the defendant.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Guy A. Hamlin for the State.*

COPELAND, Justice.

The defendant contends the trial court erred in not granting his motion to suppress his confession made to the police officers on 26 June 1978. We agree; therefore, the defendant must be granted a new trial.

Defendant argues that he was incompetent at the time the confession was made. The United States Supreme Court considered this issue in *Blackburn v. Alabama*, 361 U.S. 199, 4 L.Ed. 2d 242, 80 S.Ct. 274 (1960). That case makes it clear that an accused's confession cannot be used against him when "the evidence indisputably establishes the strongest probability that [the defendant] was insane and incompetent at the time he allegedly confessed." *Id.* at 207, 4 L.Ed. 2d at 248, 80 S.Ct. at 280.

In making this determination, we must look at all the circumstances and the entire record. *State v. Siler*, 292 N.C. 543, 234 S.E. 2d 733 (1977); *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975), *death penalty vacated*, 428 U.S. 908, 49 L.Ed. 2d 1213, 96 S.Ct. 3215 (1976). The evidence as to this defendant's probable incompetence at the time he confessed is as follows:

1. The defendant had a long history of mental illness, dating back some twelve or thirteen years, and he had been hospitalized for it several times in the past.

2. The last time he had worked for any significant period of time was in 1974.

3. Approximately one week before the confession was made, the defendant was involved in "an incident" in Greensboro resulting in his involuntary commitment to John Umstead Hospital.

4. Three days before the crime and confession in question, the defendant went to a mental health clinic. He was given medication, and an appointment with a psychiatrist was made for him for the following week. The therapist who saw him testified that the defendant's mood and affect were "inappropriate," he

had "poor judgment," and "there was a very high likelihood that he was suffering from psychotic conditions," specifically schizophrenia.

5. Mr. A. C. Ross, defendant's brother, testified that when he brought the defendant to his home from Greensboro a few days before this crime occurred and the incriminating statement was made, he was going to have the defendant go to work with him, "but after I [defendant's brother] saw his condition, he wasn't able to work." Mr. Ross had to have somebody stay with the defendant during the day while he was at work because Mr. Ross felt the defendant was not capable of looking after himself. The defendant's brother stated that he was the one who arranged for the defendant to go to the mental health clinic for medication and treatment. He related defendant's bizarre behavior of running through the woods two times without his shirt on 25 June 1978 while the two men were at a baseball game. Mr. Ross testified "it looked like he [the defendant] was just off that day [25 June 1978, the day of the crime and the day before defendant made the confession]."

6. Mr. Hudson testified that when the defendant was found in his home about 12:30 a.m. on 26 June 1978, he "looked strange" and in fact Mr. Hudson commented to the defendant that he looked strange.

7. Dr. Groce, a psychiatrist, observed and interviewed the defendant beginning on 29 June 1978, three days after the statement in question was made. He testified that the defendant at times "seemed to be confused" and had had memory problems in the past. The doctor stated that defendant was suffering from "chronic, undifferentiated schizophrenia," which includes delusions and a "misinterpretation of reality." Defendant's problem is a long standing one, and the doctor testified that it may continue "indefinitely." Dr. Groce did state, however, that defendant's condition is "variable" or "fluctuating," and the defendant is much more likely to be sane when he takes his medication, thorazine.[1]

---

1. There was evidence that the defendant had a week's prescription of thorazine issued to him on 23 June 1978. Defendant's brother testified that a few hours before the defendant was found in the Hudson home, he had told the defendant to take his medicine before going to bed. Therefore, one can infer that the defendant was properly on his medication at the time of the crime. At the time of defendant's confession, however, he had been in custody for almost twenty-four hours. There is absolutely no evidence that he had access to his medication while in jail. In fact, one of the officers who was present at the time of the statement testified during *voir dire* not only that "[t]he defendant did not appear to be under the influence of any alcoholic beverages, drugs, narcotics or medicine of any kind," but also that "I [the officer] did ask him if he was taking *any* medication." Thus, this inference cannot apply to the time defendant made his incriminating statement.

The only evidence the State introduced as to defendant's mental competence at the time of his confession was the testimony of Joe Moore, a Deputy Sheriff of Union County who was present when the statement was given. Officer Moore stated that the defendant appeared to be comfortable and "[w]hatever he said to me on that occasion, it did appear to be logical and make [sic] sense to me." Yet portions of the statement itself reveal that defendant's story to Officer Moore was not logical and sensible:

"I, James Howard Ross, went to bed [on 25 June 1978] and laid down and tried to go to sleep. And something seemed to be going wrong, and I got the urge to have sex. And I, James Howard Ross, got out of bed and tore the telephone out of the wall and threw it under the bed and started packing my bags. And I was confused, and I, James Howard Ross, just left everything there and left A. C. Ross' residence and went walking up the road. And I had sex on my mind. I walked for a while, and then I would run for a while."

The State would have us uphold the admission of defendant's confession on the mere chance that it was made during a lucid interval of the defendant. This we cannot do. In rejecting this argument, the United States Supreme Court stated:

"It is, of course, quite true that we are dealing here with probabilities. It is *possible*, for example, that [the defendant] confessed during a period of complete mental competence. Moreover, these probabilities are gauged in this instance primarily by the opinion evidence of medical experts. But this case is novel only in the sense that the evidence of insanity here is compelling, for this Court has in the past reversed convictions where psychiatric evidence revealed that the person who had confessed was 'of low mentality, if not mentally ill,' or had a 'history of emotional instability.'" *Blackburn v. Alabama*, supra at 208, 4 L.Ed. 2d at 249, 80 S.Ct. at 281. (Emphasis in original.) (Citations omitted.)

When all this evidence is weighed and considered, the inescapable conclusion is that "the confession most probably was not the product of any meaningful act of volition." *Id.* at 211, 4 L.Ed. 2d at 250, 80 S.Ct. at 282. In *Blackburn* the state had introduced evidence of that defendant's sanity when he confessed through the testimony of a policeman that the accused was clear-

eyed, talked sensibly and did not appear nervous when the statement was made and through the deposition of a doctor that in his opinion the defendant's mental condition was "normal" when the crime was committed and "good" when the confession was given. Nevertheless, after scrutinizing the entire record, the Supreme Court reversed the conviction because the trial court had admitted a confession made when the accused was in all probability mentally incompetent. Under the compelling facts in this case, we must do the same.

For the foregoing reason, we order that defendant be granted a

New trial.