STATE OF NORTH CAROLINA v. SIEGLINDE JOHNSON ALLEN

No. 714A86

(Filed 5 May 1988)

**1. Criminal Law § 75.14— murder—confession—mental capacity to waive rights**

There was an adequate basis in a murder prosecution for the judge's findings as to defendant's capacity to understand and waive her constitutional rights where defendant's court-appointed psychiatrist testified that defendant had been incapable of understanding or waiving her constitutional rights on

State √. Allen

both dates when she had made statements; defendant's psychiatrist testified that he had consulted records of defendant's evaluation at Dorothea Dix, even though he disagreed with the Dix conclusions; the district attorney cross-examined the defense psychiatrist extensively about the Dix evaluation; the defense witness was the only psychiatrist to testify; and the court found that one of the statements was admissible, making findings of fact based on the Dorothea Dix evaluation. The district attorney properly used the Dix report to impeach the defense witness, it cannot be said that the Dix records were not introduced as evidence, and the court could properly consider the defense psychiatrist's opinion, the underlying basis for that opinion, and the evidence presented to impeach the opinion. N.C.G.S. § 8C-1, Rule 703.

**2. Criminal Law § 75.14— murder—confession—voluntary**

The finding of the trial judge in a murder prosecution that defendant's confession was voluntarily given was supported by the evidence and was conclusive on appeal where impeachment evidence was used to cast doubt on the defense psychiatrist's conclusion that defendant was mentally incompetent; defendant's statement was logical and straightforward; while both the defense psychiatrist and a doctor at Dorothea Dix agreed that defendant was somewhat mentally retarded, subnormal mentality alone will not render an otherwise voluntary confession inadmissible; and the record fails to show any circumstances precluding understanding or the free exercise of defendant's will.

**3. Criminal Law § 75.1— two statements—first not a custodial interrogation—second not tainted**

In a murder prosecution in which defendant made inculpatory statements on March 6 and 7, the trial court erred by finding that the March 6 statement was the result of a custodial interrogation and the March 7 statement was therefore untainted and admissible.

**4. Jury § 6.3— voir dire—questions on insanity defense—presented to jury panel as whole**

A defendant in a murder prosecution was not denied an adequate opportunity to form a basis on which to exercise her peremptory challenges where the trial judge required defense counsel to direct certain questions concerning the insanity defense to the jury panel as a whole rather than individually. The record shows that jurors spoke up individually if the question asked of them as a panel concerned them individually.

**5. Jury § 6.3— voir dire—objections to particular question sustained**

The trial court in a murder prosecution did not err during jury selection by sustaining the State's objections to specific defense questions asking whether the jurors understood that punishment would be imposed by the trial judge if they did not return a verdict of first degree murder; whether the jurors believed a person could be so mentally ill as to be incapable of knowing the nature and quality of her act; whether a person could never have a mental illness so severe as to prevent her from knowing right from wrong; what one juror knew about schizophrenia; whether the jurors could take into account various facts and conditions; and by not allowing defendant to clarify a comment by the prosecutor concerning turning defendant loose.

**6. Criminal Law § 102.4— murder—trial hotly contested—district attorney's conduct**

The trial court in a murder prosecution did not fail to adequately control the district attorney's conduct or err by denying defendant a new trial where the trial was hotly contested, numerous objections were sustained and instructions given, and the court at one point sent the jury out and instructed both attorneys to join him in chambers to discuss abiding by the rules of court.

**7. Criminal Law § 99.2— comment of trial judge—no objection at trial—no appeal**

The defendant in a murder prosecution failed by lack of a contemporaneous objection to preserve her argument regarding the judge's comment that he did not have to listen to the evidence because that was the jury's job. N.C.G.S. § 15A-1446(a) and (b) (1983).

**8. Criminal Law § 102.6— murder—prosecutor's closing argument—not grossly improper**

The district attorney's closing argument in a murder prosecution was not so grossly improper that it required the trial court to intervene *ex mero motu.* An expert witness's compensation is a permissible subject for cross-examination and therefore argument; reading the argument in context shows that the district attorney was not arguing that the only way to insure that defendant would not kill again was to find her guilty, but that he was speaking to the four possible verdicts which would result in restraint of defendant's liberty; and, rather than arguing that defendant would not be committed if the jury found her not guilty by reason of insanity, the district attorney stated the grounds for commitment but misstated the maximum commitment.

**9. Arson § 4.1— setting fire to own apartment—evidence sufficient**

The trial court did not err in a murder and arson prosecution by not dismissing the charge of arson where the evidence substantially supported each element of arson, and, although defendant set her own apartment afire, the "dwelling of another" element was satisfied because there were several apartments in the building.

**10. Criminal Law § 112.6— murder and arson—insanity defense—instructions**

The trial court in a murder and arson prosecution did not err by refusing to include all of the evidence supporting defendant's plea of insanity in the jury instruction where the trial court gave the instruction from N.C. Pattern Jury Instruction—Crim. 304.10 and drew the jury's attention to most of the items of evidence defendant had wanted included.

**11. Criminal Law § 112.6— insanity—instruction on consideration of defendant's competence to stand trial—no error**

The trial court in a prosecution for murder and arson did not err by instructing the jury that it could consider the fact that defendant had been found competent to stand trial in its decision on the insanity defense. The finding that defendant was competent to stand trial was simply one factor that the jury could include when considering all of the evidence with regard to defendant's insanity defense; moreover, the court explained the difference between competency to stand trial and insanity and instructed that the competency finding was not conclusive or binding.

State v. Allen

**12. Homicide § 25.2— murder—instructions—premeditation and deliberation—mental deficiency**

The trial court in a murder and arson prosecution did not err by refusing to give defendant's requested instruction, which drew attention to specific aspects of diseases and deficiencies of the mind which might possibly have affected defendant's ability to commit the crime with malice or with premeditation and deliberation, where defendant's requested instruction was given in substance.

**13. Criminal Law § 112.6— murder and arson—insanity—instruction on procedures upon acquittal**

The trial court did not err in a prosecution for murder and arson in its instruction to the jury regarding procedures upon an acquittal on the grounds of insanity.

**14. Criminal Law § 112.6— murder and arson—insanity—confusing instruction clarified—no error**

There was no plain error in a prosecution for murder and arson in the court's instruction on insanity where, although the court's charge on insanity was slightly confusing at one point, the judge immediately corrected himself and clarified the matter and, although the judge failed to give the commitment instruction before the jury retired, the jury was brought back and given the commitment instruction and the judge went over the special insanity issue again.

**15. Criminal Law § 138.24— arson—very young victim as aggravating factor—prior conviction for victim's murder**

The trial court did not err when sentencing defendant for first degree arson by finding in aggravation that the victim was very young where defendant was also convicted of the child's murder. The victim's age is an aggravating factor which the court may consider in an arson case regardless of whether the arson results in a death. N.C.G.S. § 15A-1340.3 and N.C.G.S. § 15A-1340.4.

BEFORE *Freeman, J.*, and a jury at the 18 August 1986 Session of Superior Court, IREDELL County, defendant was convicted of first-degree murder and first-degree arson. Judgments sentencing her to a life term for each conviction, to run consecutively, were entered on 29 August 1986. On 8 September 1986 the trial court allowed defendant's Motion for Appropriate Relief by which she sought a new sentencing hearing on her conviction for first-degree arson. After a new sentencing hearing, a life sentence was again imposed. Defendant appeals as of right pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 9 November 1987.

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy, Assistant Attorney General, for the State.*

*Edmund L. Gaines and James B. Mallory III for defendant-appellant.*

MEYER, Justice.

Defendant was convicted of the first-degree murder of her infant son and of first-degree arson. On appeal, her assignments of error relate to: (1) the admissibility of her inculpatory statements to law enforcement officials, (2) the restriction of her inquiries of potential jurors during jury selection, (3) the district attorney's conduct during the trial, (4) the trial court's failure to dismiss the arson charge, (5) the trial court's jury instructions, and (6) the trial court's finding and use of an aggravating factor in sentencing defendant to life for the arson conviction. We find no error in defendant's trial.

The State's evidence tended to show the following sequence of events. On 6 March 1985 defendant was living in an apartment with her husband and two children in Statesville, North Carolina. Defendant's younger child, Thomas Steven Allen, was approximately five weeks old at the time. At about ten o'clock that morning, defendant and her elder child went to visit her neighbor, Edwin Dyer, whose house was fifty yards away. During the course of her visit with Mr. Dyer and his wife, defendant got up three times to go to the door and look towards her apartment. After thirty to forty-five minutes, defendant left the Dyers' house. She returned very shortly and told Mr. Dyer that her apartment was on fire. Mr. Dyer went to defendant's apartment but was unable to enter because of the smoke. Mrs. Dyer called defendant's landlord who, after several attempts to determine the source of the smoke, discovered a fire behind a bedroom door. He entered the bedroom, where he saw a great deal of smoke and a fairly large circle of flames. Shining a flashlight into the room, he also saw a crib and the body of an infant lying on its stomach. The child was badly burned about the legs and feet. Later, a volunteer fireman observed that the infant's nose and mouth were filled with black mucus and that its right foot was almost entirely burned off.

State Bureau of Investigation Agent David Campbell found that the crib's floor had been burned from the top downwards and that the subflooring beneath the bedroom carpet was charred. The burn patterns of the subflooring showed the use of a flammable accelerant. He found a bottle of alcohol in a baby necessity basket in the apartment's kitchen. In his expert opinion, the fire started inside the crib and after some burning and running of the flammable liquid, the fire fell down onto the floor beside the crib. He further testified that the fire was set by human hands.

Defendant was asked to go to the Sheriff's Department to answer some questions about the fire. She was questioned by State Bureau of Investigation Agent David Keller and Detective Gary Edwards of the Iredell County Sheriff's Department. Defendant made several incriminating statements about her role in the death of her infant son. These 6 March 1985 statements were subsequently suppressed by Judge Fetzer Mills on the grounds that defendant had made them during an "in-custody interrogation" without having been properly advised of her right to have an attorney appointed to represent her if she could not afford one.

After making these inculpatory statements, defendant was taken before a magistrate. Warrants were obtained and served upon her, charging her with first-degree murder and first-degree arson. She was incarcerated overnight in the Iredell County jail. Early the next morning, on 7 March 1985, Detective Edwards went to the jail and interviewed defendant. After fully advising her of her *Miranda* rights, he wrote down a statement defendant made to him and she signed it. The gist of this statement was that on 6 March defendant was alone with her two children in the apartment. She went to the kitchen and got a bottle of alcohol. She then went to the bedroom, poured alcohol around the crib as well as on the infant's feet and legs, and set fire to the crib with a cigarette lighter. She watched the fire burn for about a minute and then left the apartment and, taking her elder child, went to her neighbors', where she stayed for about thirty minutes. Defendant stated that she wanted to kill her infant son and had been thinking about burning the child for a few days. She said she had previously tried to kill her daughter by smothering the child with a pillow. This 7 March 1985 statement was admitted into evidence at trial.

Defendant pled not guilty by reason of insanity. At the pretrial hearing on defendant's motion to suppress the 6 and 7 March statements, a court-appointed forensic psychiatrist testified that on 6 and 7 March, when the statements were made, defendant lacked sufficient mental capacity to know and understand her constitutional rights or to make a knowing and intelligent waiver of those rights. At trial, defendant presented testimony that as a result of her attempt to suffocate her daughter in 1984, she had been admitted to Catawba Memorial Hospital in Hickory, where she was diagnosed as suffering from a major depression with psychosis. Further testing in that year yielded the conclusion that defendant suffered from schizophrenia, disorganized type, with paranoid features. Following her release from Catawba Memorial, defendant continued in therapy for a short while, but then her case was terminated and by June 1984, she was back with her husband and daughter. At about this time, she became pregnant with her son, the victim in this case. The child was born in February 1985.

The court-appointed psychiatrist, Dr. Selwyn Rose, evaluated defendant and treated her prior to trial. He testified at trial that at the time of the fire defendant suffered from paranoid schizophrenia and mental retardation such that she lacked the capability of knowing the nature and quality of her behavior. The jury nevertheless found defendant guilty of both first-degree murder, for which it recommended a life sentence, and of first-degree arson.

I

[1] At the pretrial hearing on defendant's motion to suppress both her 6 and 7 March 1985 inculpatory statements, Dr. Rose testified to the effect that defendant was incapable of understanding or waiving her constitutional rights on both dates because of her mental retardation and schizophrenia. The court ruled that defendant's 7 March statement was admissible. In its order, the court made findings of fact based on an evaluation of defendant made by Dr. Mary Rood at the Dorothea Dix Hospital in the weeks following defendant's arrest. Defendant now attacks the findings in the court's order as based on incompetent evidence. She argues that not only did the Dorothea Dix report pertain solely to her capacity to proceed to trial, but also that because it

was not properly introduced at the pretrial hearing, the court should not have considered it when making its ruling on her ability to waive her constitutional rights. She further argues that the only competent evidence on the question of her mental ability was Dr. Rose's testimony. We disagree.

Prior to petitioning the court for funds to hire Dr. Rose, defendant's counsel obtained an order committing defendant to Dorothea Dix in order to determine her capacity to proceed to trial, pursuant to N.C.G.S. § 15A-1002. Defendant's counsel also requested the Dorothea Dix staff to evaluate defendant's capacity to distinguish between right and wrong at the time of the offenses. At the pretrial hearing, Dr. Rose testified on direct examination that he had consulted the Dorothea Dix evaluation as well as other medical records in forming his opinion about defendant's ability to understand and waive her constitutional rights. On cross-examination, the district attorney questioned Dr. Rose extensively about the Dorothea Dix evaluation. The record discloses that although Dr. Rose acknowledged the results of the tests performed on defendant at Dorothea Dix as being accurate, he disagreed with the conclusions drawn from them. N.C.G.S. § 8C-1, Rule 705 provides in part that an expert may be required on cross-examination to disclose the underlying facts or data upon which he relied in forming his expert opinion. The district attorney, therefore, properly used the conclusions in the Dorothea Dix report, parts of which he read to Dr. Rose, to impeach the latter's opinion under Rule 705 as to defendant's ability to understand and waive her constitutional rights.

Defendant argues that the record does not demonstrate conclusively that the Dorothea Dix report was properly introduced into evidence. We note, however, that the following exchange took place during the district attorney's cross-examination of Dr. Rose:

Q: And now with reference to that report from Dorothea Dix, have you found that, sir?

A: I don't find my copy. Can I borrow somebody's, please? It is in a mass of data here, I think.

Q: I understand.

A: Yes, I have it in front of me now.

MR. GAINES: I object to questions concerning the report from Dorothea Dix.

MR. ZIMMERMAN: I am going to offer it to the Court on Voir Dire. I think it is competent and has been competent in every case I have tried in the past sixteen years.

COURT: Over-ruled, go ahead.

We also note that in the table of exhibits prepared by the court reporter, the Dorothea Dix records are listed as introduced as State's Exhibit No. 6. We cannot say, therefore, that the Dorothea Dix report was not introduced as evidence. The State argues that the trial court could correctly admit and consider the report under N.C.G.S. § 8C-1, Rule 703. We agree. Under Rule 703, an expert may give his opinion based on facts not otherwise admissible in evidence provided that the information considered by the expert is of the type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject. Prior to the enactment of Rule 703, this Court had adopted a policy that allowed experts to give their opinion when the information upon which they relied met an "inherently reliable" test. *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985); *State v. Wood*, 306 N.C. 510, 294 S.E. 2d 310 (1982), *appeal after remand*, 310 N.C. 460, 312 S.E. 2d 467 (1984); *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979). The official Commentary notes that although Rule 703 requires that the facts or data "be of a type reasonably relied upon by experts in the particular field" rather than that they be "inherently reliable," the thrust of *Wade* is consistent with the rule. In *Wood* we observed that

> [t]estimony as to matters offered to show the basis for a physician's opinion and not for the truth of the matters testified to is not hearsay. "We emphasize again that such testimony is not substantive evidence." *State v. Wade*, . . . 296 N.C. at 464, 251 S.E. 2d at 412. Its admissibility does not depend on an exception to the hearsay rule, but on the limited purpose for which it is offered.

*State v. Wood*, 306 N.C. at 516-17, 294 S.E. 2d at 313. In *Huffstetler* we noted little difference between the "inherently reliable" standard and the "reasonable reliance" standard. In the

case *sub judice* the trial court could properly admit the Dorothea Dix report under Rule 703 for the limited purpose of showing part of the underlying basis of Dr. Rose's opinion.

Under Rule 705 the district attorney had demonstrated to the trial court, sitting as finder of fact, that some of the underlying data that Dr. Rose used in reaching his opinion about defendant's mental condition was directly contrary to that opinion. The Dorothea Dix report concluded that (1) defendant was intellectually limited but not mentally ill, (2) she was capable of proceeding to trial, and (3) she was able to distinguish right from wrong as to the charges against her. The trial court was required to make a decision on the admissibility of defendant's 7 March inculpatory statement based on defendant's mental capacity. In order to do this, the court could properly consider Dr. Rose's opinion, the underlying bases for that opinion, and the evidence presented to impeach that opinion. Merely because Dr. Rose was the only psychiatrist to testify at the hearing does not mean that the court was obligated to find his opinion dispositive, particularly when some of the underlying data he consulted and partially agreed with had reached a contrary conclusion. Judge Mills properly noted in his order that information contrary to Dr. Rose's opinion had been brought out on cross-examination and that this information was part of the underlying data upon which Dr. Rose had based his opinion.

The presumption in non-jury trials is that the court disregards incompetent evidence in making its decision. *City of Statesville v. Bowles*, 278 N.C. 497, 180 S.E. 2d 111 (1971). We have on numerous occasions held that if a trial judge's findings of fact are supported by competent evidence, they are conclusive on appeal. *See, e.g., State v. Jackson*, 302 N.C. 101, 273 S.E. 2d 666 (1981). A trial judge's findings of fact will be reversed only where it affirmatively appears that they are based in whole or in part upon incompetent evidence. *State v. Davis*, 290 N.C. 511, 227 S.E. 2d 97 (1976). It cannot be said that the trial judge's findings here are based upon incompetent evidence. It was within Judge Mills' prerogative to disbelieve Dr. Rose's testimony, especially in view of the fact that his testimony was substantially impeached. The only evidence offered to rebut the presumption of competency having been rejected, Judge Mills was left with the presumption. In addition, there was defendant's statement which was entirely coher-

ent, which was completely responsive to the questions asked when the statement was taken, and which coincided with the evidence found at the scene and disclosed by the investigation. We conclude that there was an adequate basis for Judge Mills' findings of fact as to defendant's capacity to understand and waive her constitutional rights.

[2] Defendant goes on to argue that the evidence of her mental illness and diminished mental capacity was sufficient to prove that she lacked the ability to give a voluntary statement. She relies on *State v. Ross*, 297 N.C. 137, 254 S.E. 2d 10 (1979), in which we held that a defendant's confession cannot be used against her when " 'the evidence indisputably establishes the strongest probability that [the defendant] was insane and incompetent at the time [s]he allegedly confessed.' " *Id.* at 141, 254 S.E. 2d at 12 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 207, 4 L.Ed. 2d 242, 248 (1960) ). Defendant's reliance on *Ross* is misplaced. There, the defendant, convicted of first-degree burglary, was suffering from chronic, undifferentiated schizophrenia, which included delusions and a misinterpretation of reality. The only evidence the State introduced as to defendant's mental competence was the testimony of a deputy sheriff present when defendant gave his statement. Portions of the statement were neither logical nor sensible. Here, in contrast, impeachment evidence was used to cast doubt upon Dr. Rose's conclusion that defendant was mentally incompetent. Defendant's statement was logical and straightforward. We cannot conclude that the evidence here indisputably establishes that defendant was insane at the time she confessed.

Moreover, in *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976), we reaffirmed our holding in *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975), that subnormal mentality is a factor to be considered in determining the voluntariness of a confession but that this condition, standing alone, does not render an otherwise voluntary confession inadmissible. Both Dr. Rose and Dr. Rood at Dorothea Dix agreed that defendant was somewhat mentally retarded. Under *White*, slight mental retardation would not render defendant's 7 March confession inadmissible unless other circumstances precluding understanding or the free exercise of will were present. When Detective Edwards interviewed defendant at the jail, he read each of defendant's constitutional rights to her. She indicated that she understood them and she signed a

waiver of rights form. She made the statement which the detective wrote out for her. After reading it, defendant signed the statement. The record fails to show any circumstances precluding understanding or the free exercise of defendant's will. We conclude therefore that Judge Mills' finding that defendant's 7 March confession was voluntarily given was supported by competent evidence and is conclusive on appeal.

[3] Defendant finds a second basis upon which to build her argument that her 7 March inculpatory statement was inadmissible. Judge Mills suppressed her 6 March statement because he found it to be the result of an in-custody interrogation prior to which flawed *Miranda* warnings had been given. Defendant contends that the 6 March statement resulted from an unlawful seizure of her person which then tainted the 7 March confession. *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 829 (1979). The State argues that Judge Mills erred in concluding that defendant was in custody when she was questioned on 6 March, so that her 7 March confession remains untainted. We agree.

We begin with the premise that *Miranda* warnings need only be given to a person who is subjected to custodial police interrogation. *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982). There, we stated:

> Thus, if it be concluded that a defendant was not "in custody" at the time of questioning, a reviewing court need not consider whether he was subjected either to express questioning or its equivalent, as such considerations come into play only for the purpose of determining whether a person has been "interrogated" after it has been concluded that he was "in custody" at the crucial time. If it be determined that he was not in custody, then it may be concluded *ipso facto* that he was not interrogated for *Miranda* purposes, and the reviewing court is not required to consider whether [he] waived his rights under *Miranda*. . . . [Citing *Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed. 2d 297 (1980).]
>
>     . . . .
>
> In determining whether a defendant is "in custody" for *Miranda* purposes, however, the reviewing court may rely upon neither the subjective intent of the police to restrain

him nor the subjective belief of the defendant as to what the police would do if he attempted to leave. Instead, the reviewing court must determine whether the suspect was in custody based upon an objective test of whether a reasonable person in the suspect's position would believe that he had been taken into custody or otherwise deprived of his freedom of action in any significant way or, to the contrary, would believe that he was free to go at will. *See United States v. Mendenhall*, 446 U.S. 544, 554, 64 L.Ed. 2d 497, 509, 100 S.Ct. 1870, 1877 (1980).

*Id.* at 409, 410, 290 S.E. 2d at 580-81.

The transcript of the suppression hearing shows that State Bureau of Investigation Agent Keller went to defendant's apartment on 6 March and learned from Agent Campbell, a specialist in arson investigations, that the fire had been set by human hands with a liquid accelerant. Agent Campbell then introduced Agent Keller to defendant and asked her if she would talk to them at the Sheriff's Department, to which request defendant agreed. Defendant's minister asked to speak to defendant and was allowed to do so. Defendant, her husband and her sister-in-law were then driven in Agent Keller's car to the Sheriff's Department. The officers interviewed defendant's husband for approximately thirty minutes while defendant and her sister-in-law waited downstairs. Defendant was then asked to come upstairs, was informed that she did not have to talk to the officers and was told that they wanted to interview her about the facts surrounding her child's death. She was twice informed that she was free to go before Agent Keller advised her of all her *Miranda* rights except that if she could not afford to hire an attorney, one would be appointed to represent her. Defendant then proceeded to give a series of explanations as to how the fire started. The interview was conducted in a room that Detective Keller described as comfortable. He testified that defendant was not threatened in any way and that she would have been allowed to leave the room at any time during the hour and thirty-five minute interview had she so desired. She did not choose to do so.

This evidence leads us to the conclusion that a reasonable person in defendant's position would not have believed that she had been taken into custody or otherwise deprived of her freedom

of action in any significant way. On the contrary, a reasonable person in defendant's position would have believed that she was free to go at will. *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574. We hold that defendant was not in custody when she made her 6 March inculpatory statement, so that *Miranda* warnings were not necessary at that time. The court erred in suppressing defendant's 6 March statement. Moreover, defendant's 7 March statement was untainted and admissible. Defendant's complaint that she was unlawfully seized is accordingly without merit. Defendant's assignments of error with regard to the admissibility of her 7 March statement are overruled.

II

Defendant next argues that the trial court erred in restricting the form and substance of certain questions her defense counsel asked of potential jurors as well as the manner in which these questions were asked. The questions fall into two categories: (1) inquiry of individual jurors concerning the insanity issue, and (2) various specific inquiries to which the trial court sustained the district attorney's objections.

We begin with the premise that the presiding judge has the duty to supervise the examination of prospective jurors. Regulation of the manner and the extent of inquiries on voir dire rests largely in the trial judge's discretion. *State v. Young*, 287 N.C. 377, 387, 214 S.E. 2d 763, 771 (1975), *death penalty vacated*, 428 U.S. 903, 49 L.Ed. 2d 1208 (1976); N.C.G.S. § 9-14 (1986). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Barts*, 316 N.C. 666, 682, 343 S.E. 2d 828, 839 (1986).

[4] We turn now to the first category of questions about which defendant complains. Defendant's counsel wanted to put certain questions relating to the insanity defense to each juror individually. The trial court, however, required him to direct these questions to the jury panel as a whole rather than to individual jurors. The questions included, for example, whether any juror had visited a person in a mental hospital, had been a patient in such a hospital, believed that psychiatry or psychology was not a legitimate part of the medical profession, or disagreed with the concept that a person incapable of understanding the difference

between right and wrong due to some mental illness should be found not guilty by reason of insanity.

In *State v. Young*, 287 N.C. 377, 214 S.E. 2d 763, we stated:

> The voir dire examination of prospective jurors serves a dual purpose: (1) to ascertain whether grounds exist for challenge for cause and (2) to enable counsel to exercise intelligently the peremptory challenges allowed by law. *State v. Allred*, 275 N.C. 554, 169 S.E. 2d 833 (1969). "Obviously, prospective jurors may be asked questions which will elicit information not, per se, a ground for challenge in order that the party, propounding the question, may exercise intelligently his or its peremptory challenges." *State v. Jarrette*, [284 N.C. 625, 292 S.E. 2d 721 (1974)].

*State v. Young*, 287 N.C. at 387, 214 S.E. 2d at 771. *See also* N.C.G.S. § 15A-1214(c) (1986). Defendant contends that because her defense counsel was forced to ask these questions of the jury panel as a whole, the opportunity adequately to base the use of her peremptory challenges upon identification of prejudiced or biased jurors was lost. Our examination of the transcript of the jury voir dire persuades us otherwise. The record shows that the jurors spoke up individually if the question asked of them as a panel concerned them individually. For example, defendant's counsel was permitted to ask the panel whether any juror disagreed with the concept of the insanity defense and then was permitted to ask and obtain an answer from each individual juror. His other questions relating to the insanity defense were answered individually by the jurors where necessary. We conclude therefore that defendant was not denied an adequate opportunity to form a basis upon which to exercise her peremptory challenges.

[5] The second category of questions about which defendant complains is also related to her insanity defense, but here the trial court sustained the district attorney's objections to each specific question, and the questions were not answered. We address these questions seriatim.

First, defendant asked the jurors whether they understood that if they did not return a verdict of first-degree murder, punishment would be imposed by the trial judge. After the trial

judge sustained the district attorney's objection, he informed counsel that he would instruct the jury as to the applicable law at the appropriate time. This was entirely proper.

Second, defendant asked the jurors whether they believed that a person could be so mentally ill as to be incapable of knowing the nature and quality of her act, and whether they believed that a person could never have a mental condition so severe as to prevent her from distinguishing between right and wrong. These questions had been previously asked of the jurors, though in slightly different wording, and were therefore repetitious. The trial court properly sustained the district attorney's objections.

Third, defendant asked one juror what she knew about schizophrenia. The trial judge sustained an objection to the question. Defendant then was allowed to ask a barrage of questions to the same effect of the entire panel. This assignment of error is meritless.

Fourth, defendant asked numerous questions which inquired of the jurors whether they could take into account various facts and conditions when making their decision on defendant's guilt or innocence. Again, most of these questions related to the insanity defense. Objections to a number of these questions were sustained. Many of those to which objections were sustained were repetitious, some speculated as to what the evidence might show, and others were simply attempts to stake out the jurors as to what their decision would be if they found certain facts to exist. The trial court properly sustained the district attorney's objections to these questions.

Finally, defendant complains that she was prevented from clarifying a comment by the district attorney concerning "turning [defendant] loose" by not being allowed to question jurors concerning what they believed would happen to defendant if they found her not guilty. The district attorney had stated that if a person was guilty and the State proved it, then that person should be convicted and punished. If a person was not guilty, or the State failed to prove guilt, then the person should be "turned loose." We note that when the district attorney made these remarks, defendant immediately objected to "the turning loose business." The trial court sustained defendant's objection, thereby vitiating any prejudice to defendant. Any possible

adverse impact on the jury was created by defendant's own subsequent repeated references to the phrase.

We conclude that the trial court did not abuse its discretion in its management of the jury voir dire in defendant's case. These assignments of error are overruled.

### III

[6]   Defendant next attacks the district attorney's conduct during the trial, characterizing it as improper and prejudicial throughout. Further, she maintains that the trial court failed in its duty to control the trial by failing to curtail the district attorney's behavior, and erred in denying her a new trial on the grounds of the district attorney's improper arguments during his closing. We find the district attorney's conduct less than laudable, but we conclude that it was not sufficiently prejudicial to warrant the trial court's *ex mero motu* intervention or to grant defendant a new trial.

Defendant directs our attention to thirty-eight different instances of the district attorney's conduct, which she describes as ranging from sarcastic comments to impertinent and insulting interruptions during defendant's direct examination of her own witnesses. The State makes a valiant attempt to find justification for the district attorney's behavior in each instance. Several examples will suffice to suggest the flavor of this contest.

Defendant explains that on direct examination of one of her expert witnesses, a Dr. Blumenthal, defense counsel asked him if a Mr. Wagner's testing results were consistent with what he had found in January 1984. After Dr. Blumenthal answered, the district attorney objected and stated, "[T]here's no consistency of Mr. Wagner in their data." Defendant argues that the district attorney was thus able to contradict the witness' testimony on direct examination by his own statements. The State argues that the district attorney was merely stating the grounds for his objection. Again, during direct examination of defendant's witness Dr. Selwyn Rose, the district attorney objected and moved to strike an answer Dr. Rose had given. The district attorney then added, "Your Honor please, this is absolutely ridiculous." Defense counsel requested an instruction on this remark. The trial court thereupon instructed *both* attorneys to refrain from making com-

ments, even though the improper remark had come from the district attorney alone. The State argues that the context of this remark was Dr. Rose's speculation as to how officers were able to get statements from defendant about her child's death when, as Dr. Rose testified, she was so disconnected from it. Finally, during Dr. Rose's cross-examination, defense counsel objected. The district attorney made the following comment, "I'm not interested whether you think it's sick or not. The idea of killing a fetus is sick to me. What do you think about it?" Upon further objection, the district attorney withdrew his question and the trial court then sustained defense counsel's objection. The State argues here that this occurred during the cross-examination of a critical defense witness and that the trial court's action cured any error. Other examples include the district attorney's allegedly deliberate mispronunciation both of a defense witness' name and of defendant's mental malady.

We have carefully reviewed the entire transcript, but in the recognition that this was a hotly contested trial, we cannot discern *prejudicial* error. The conduct of a trial is left largely to the control and discretion of the presiding judge. *Hamilton v. Henry*, 239 N.C. 664, 80 S.E. 2d 485 (1954). Numerous objections of counsel were sustained and numerous instructions given throughout the trial. We note that at the end of the third day of trial, when defendant moved for a mistrial on grounds of the district attorney's misconduct, the trial judge made the following comment:

THE COURT: Certainly the basic conduct of the trial is within the discretion of the trial court. I will concede that some of [the district attorney's] comments are improper as well as some of [defense counsel's], and I'd appreciate it if both of you would refrain from improper comments and that sort of thing. And I guess I'll just have to start embarrassing you in front of the jury and maybe that will have some effect on it, but things will go a lot smoother and a lot quicker and probably serve both your clients better if you both acted in a courteous and gentlemenly [sic] manner.

The trial judge denied defendant's motion. The next morning, the district attorney offered an apology to the court for any improper comments he might have made and for his interruption of witnesses. He stated that rather than interrupt, he would in the

future make an objection. In spite of this resolve, however, as the trial wore on, the trial court was obliged to warn both attorneys to refrain from making comments and arguing objections in front of the jury. At one point, the jury was sent out. The trial court then instructed both lawyers to join him in chambers to discuss abiding by the rules of court. The transcript shows that this discussion appears to have had some effect. We cannot say therefore that the trial court failed adequately to control the district attorney's conduct to the point that defendant was prejudiced, or that it erred in denying defendant a new trial grounded on this conduct.

We should not be understood, however, as facilely condoning the behavior demonstrated by the record before us. Trials should not be allowed to degenerate into a battle of personalities in which the interests of the parties and the rules of court are pushed aside by the efforts of opposing counsel to upstage each other. *See* General Rules of Practice, Rule 12 (1987) (Courtroom Decorum); North Carolina Rules of Professional Conduct, Canon VII, Rule 7.1 (Vol. III 1985) (Representing the Client Zealously).

[7] Defendant next argues that the trial judge made an improper comment to the effect that he did not have to listen to the evidence because that was the jury's job. Defense counsel did not object to the comment in question at trial, but apparently objected to it in the local newspaper. The comment does not appear in the transcript, but the trial judge later explained its context and his intent on the record, although out of the jury's presence. We conclude, however, that defendant has failed to preserve her argument because of the lack of contemporaneous objection. N.C.G.S. § 15A-1446(a) and (b) (1983). This assignment of error is overruled.

[8] Defendant's final contention is that the trial court erred in failing to intervene in the State's closing argument to stop the district attorney's improper arguments and in failing to grant defendant a new trial on the same grounds. Defendant specifically complains that the district attorney should not have argued to the jury that her expert witnesses were being compensated to testify, or that the only way to assure that she would not kill again was to find her guilty, or that if the jury should find her not guilty by reason of insanity, she might be released within ninety days. Defendant's contention is without merit.

The law in this area is clear. We have consistently held that counsel must be allowed wide latitude in the argument of hotly contested cases. He may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his side of the case. *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125; *State v. Noell*, 284 N.C. 670, 202 S.E. 2d 750. Whether counsel abuses his privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury.

*State v. Covington*, 290 N.C. 313, 327-28, 226 S.E. 2d 629, 640 (1976). A close reading of the district attorney's closing argument reveals no such gross impropriety.

First, an expert witness' compensation is a permissible cross-examination subject to test partiality towards the party by whom the expert was called. *State v. Creech*, 229 N.C. 662, 51 S.E. 2d 348 (1949). Here, the district attorney questioned Dr. Rose and Mr. Wagner about payment for their services. He could therefore properly argue the evidence he had drawn from them to the jury. Second, the district attorney's alleged implication that the only way to ensure that defendant would not kill again was to find her guilty rather than not guilty by reason of insanity is not borne out by the record. A reading of this portion of the closing argument in context shows that the district attorney was speaking to the four possible verdicts which would result in the restraint of defendant's liberty. This Court has held that a prosecutor may properly ask the jury to return the highest degree of conviction and the severest punishment available for the crime. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984). Third, the district attorney did not argue that defendant would not be committed if the jury found her not guilty by reason of insanity. Rather, he stated the grounds for commitment but misstated the maximum recommitment period. When considered in the totality of the argument, this misstatement did not rise to the level of prejudicial error. We are unable to conclude that the district attorney's closing argument was so grossly improper that it required the trial court's intervention *ex mero motu*. Neither does it warrant a new trial. These assignments of error are overruled.

## IV

**[9]**  Defendant next argues that the trial court erred in failing to dismiss the arson charge against her. She contends that the State failed to present evidence that she intended to burn the apartment. This argument fails.

The common law definition of arson is in force in this state. Arson is the willful and malicious burning of the dwelling house of another person. *State v. Vickers*, 306 N.C. 90, 291 S.E. 2d 599 (1982).

> "For a burning to be 'wilful and malicious' in the law of arson, it must simply be done 'voluntarily and without excuse or justification and without any bona fide claim of right. An intent or animus against either the property itself or its owner is not an element of the offense' of common law arson."

*State v. White*, 291 N.C. 118, 126, 229 S.E. 2d 152, 157 (quoting *State v. White*, 288 N.C. 44, 50, 215 S.E. 2d 557, 561 (1975)). The evidence in this case substantially supports each element of arson. One can reasonably infer from the act of setting fire to the infant's crib and then leaving the apartment for a period of at least thirty minutes that the fire would spread to the structure around the crib. Defendant would hardly have left her apartment, taking her elder child with her, had she not anticipated that it would catch fire. While she visited her neighbors, she left her seat three times to look at her apartment from their front door. The reasonable jury inference from these actions was that defendant intended the apartment to burn and was looking to see if it was on fire.

Though defendant set her own apartment afire, the "dwelling house of another" element of common law arson is satisfied here. The record reflects that the building in which defendant resided was an apartment house consisting of several apartments in a single building. If a dweller in an apartment house burns the building, he or she is guilty of arson even though the fire is confined to the rooms occupied by the wrongdoer, because the building is the dwelling house of the other tenants. The trial judge properly instructed the jury on this aspect of the case.

[T]he main purpose of common law arson is to protect against danger to those persons who might be in the dwelling house which is burned. Where there are several apartments in a single building, this purpose can be served only by subjecting to punishment for arson any person who sets fire to any part of the building.

*State v. Jones*, 296 N.C. 75, 77-78, 248 S.E. 2d 858, 860 (1978).

Defendant's assignments of error in this regard are overruled.

V

[10]  Defendant's next complaint concerns the trial court's jury instructions. Although requested to do so, the court refused to include all of the evidence supporting defendant's plea of insanity in the jury instruction on this defense. She argues that the court's refusal to give defendant's requested instruction prejudiced her because the insanity defense was the crux of her case. We find no prejudice. The trial court gave the instruction from N.C.P.I.— Crim. 304.10, and although it refused to give defendant's requested instruction verbatim, it drew the jury's attention to most of the items of evidence defendant had wanted included. A trial court is not required to give requested instructions verbatim. *State v. Beach*, 283 N.C. 261, 196 S.E. 2d 214 (1973). Defendant's requested instruction was given in substance. This argument is without merit.

[11]  Defendant argues that the trial court erred in instructing the jury that it could consider the fact that defendant had been found competent to stand trial in its decision on the insanity defense. We disagree. Evidence was introduced at trial describing defendant's behavior immediately before and after the crimes, in addition to which the jury observed defendant's behavior during the trial. Defendant herself presented exhaustive evidence of the testing she underwent before and after the crimes. That she had been found competent to stand trial after the crimes was simply one factor that the jury could include when considering all the evidence with regard to defendant's insanity defense. Moreover, although the tests for competency to stand trial and insanity are different, the trial court explained the difference to the jury, and instructed it that the competency finding was not conclusive or

binding in its decision on the insanity defense. We conclude that the trial court did not err in its instruction on defendant's insanity defense. This assignment of error is overruled.

[12] Defendant next contends that the trial court erred in refusing to give her requested instruction that drew attention to specific aspects of the diseases and deficiencies of the mind which might possibly have affected her ability to commit the murder with malice or with premeditation and deliberation. We are not so persuaded. The trial court gave an instruction following N.C.P.I. —Crim. 206.10 which included an explanation of intent, premeditation and deliberation. In addition, the court instructed the jury as follows:

> Now, specific intent to kill is a necessary ingredient of premeditation and deliberation. If the defendant does not have the mental capacity to form an intent to kill or to premeditate and deliberate upon the killing, she cannot be convicted of murder in the first degree whether such mental deficiency be due to disease of the mind or some other cause.

Defendant's requested instruction concerning the effect of mental deficiency arising from diseases of the mind was given in substance. The trial court did not err in the instruction it gave. *See State v. Monk*, 291 N.C. 37, 229 S.E. 2d 163 (1976).

[13] Defendant also requested a jury instruction to the effect that if the jury should find her not guilty by reason of insanity, she had stipulated that she met the criteria for involuntary commitment under article 5A of chapter 122 of the North Carolina General Statutes. The trial court refused to do so. Defendant now argues that the instruction that the trial court *did* give was insufficient to alleviate the jury's fears that she would be allowed to go free if it found her not guilty by reason of insanity. The State contends that the trial court's instruction complied with this Court's decision in *State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976). We agree. In *Hammonds* we held that "upon request, a defendant who interposes a defense of insanity to a criminal charge is entitled to an instruction by the trial judge setting out in *substance* the commitment procedures outlined in G.S. 122-84.1, applicable to acquittal by reason of mental illness." *Id.* at 15, 224 S.E. 2d at 604 (emphasis added). Chapter 122 has been repealed and replaced by chapter 122C. The trial court gave the pattern

jury instruction in N.C.P.I.—Crim. 304.10 which informed the jury of the commitment hearing procedures in N.C.G.S. §§ 15A-1321 and -1322, pursuant to article 5 of chapter 122C. This instruction adequately charged the jury regarding procedures upon acquittal on the ground of insanity. *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587. Defendant's assignment of error is overruled.

[14] Defendant's final assignment of error in this area is that the trial court erred because it instructed the jury on the insanity defense in a confusing manner. In addition, she claims prejudicial error from the court's failure to instruct on commitment procedures before sending the jury out, making it necessary to bring the jury back for this purpose. We disagree.

Since defendant failed to object at trial on the grounds she here alleges, we review for plain error. *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983); N.C.R. App. P. 10(b)(2). We find none. Our reading of the trial court's jury instructions reveals that at one point the judge's charge regarding the jury's consideration of and answer to the insanity issue was slightly confusing, but the judge immediately corrected himself and clarified the matter. Although he failed to give the commitment instruction before it retired, the jury was brought back and given the commitment instruction. At the same time, the judge went over the special insanity issue again. We conclude that this is not the " 'exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." ' " *State v. Odom*, 307 N.C. at 660, 300 S.E. 2d at 378 (quoting *United States v. McCaskill*, 676 F. 2d 995, 1002 (4th Cir. 1982) ). These assignments of error are overruled.

## VI

[15] Finally, defendant contends that the trial court erred at defendant's second sentencing hearing on the arson conviction in finding in aggravation that the victim was very young. N.C.G.S. § 15A-1340.4(1)(j) (1983). She argues that use of the infant's age as an aggravating factor in the arson case was a form of double jeopardy, as she had already been convicted of the child's murder. She also contends that the aggravating factor applies only to offenses against persons and not to offenses against property, such as arson. Defendant has misunderstood the law. Under N.C.G.S.

§§ 15A-1340.3 and -1340.4 the victim's age is a statutory aggravating factor which the court may consider in the arson case regardless of whether the arson results in a death. The court therefore did not aggravate the sentence for arson based on defendant's conviction in the joined murder.

Moreover, defendant was convicted of first-degree arson. First-degree arson, as distinguished from second-degree, arises where the dwelling house is occupied at the time of the burning. N.C.G.S. § 14-58 (1986). First-degree arson is an offense against both persons and property. N.C.G.S. § 15A-1340.4(1)(j) addresses the victim's *vulnerability. State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689 (1983). Even had defendant's child not been harmed by the burning, if it resulted in sufficient charring to constitute arson, defendant would be guilty of first-degree arson and the child's vulnerability because of its young age could still have been used to aggravate defendant's arson conviction. This aggravating factor stands independent of the murder conviction and the trial court could properly consider it. Defendant's assignments of error are overruled.

We hold that defendant received a fair trial, free of prejudicial error.

No error.